IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEYANA GIBSON BROWN<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | Case No. 26-cv-1131 |
| GARRISON GIBSON BROWN<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | **COMPLAINT FOR SET-ASIDE AND<br>DECLARATORY RELIEF**<br>**(ICE policy of forcibly entering homes<br>without a judicial warrant)** |
| JEYLI SALGUERO<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | |
| NOE ALFREDO SALGUERO<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | |
| RHODA CHRISTENSON<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | |
| ABDULKADIR SHARIF ABDI<br>c/o Protect Democracy Project<br>2020 Pennsylvania Ave NW<br>Washington DC 20006 | |
| Plaintiffs,<br><br>v. | |

MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*
245 Murray Lane SW
Washington, DC 20528

U.S. DEPARTMENT OF HOMELAND SECURITY
245 Murray Lane SW
Washington, DC 20528

TODD M. LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*
500 12th Street SW
Washington, DC 20024

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, DC 20024

BENJAMINE HUFFMAN, *in his official capacity as Director of Federal Law Enforcement Training Center*
1131 Chapel Cross Road
Glynco, GA 31524

FEDERAL LAW ENFORCEMENT TRAINING CENTER
1131 Chapel Cross Road
Glynco, GA 31524

Defendants.

**INTRODUCTION**

1.      "The physical entry of the home is the chief evil" the Fourth Amendment was designed to address. *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (citation modified). Accordingly, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). It has long been clear that to enter a home without consent, a judicial warrant is required.

2.      Immigration agents have followed this foundational Fourth Amendment law for decades. From its inception in 2001 until very recently, the United States Department of Homeland Security ("DHS") followed an express policy, consistently and uniformly applied, complying with the Fourth Amendment's protections against unreasonable searches and seizures by forbidding agents of Immigration & Customs Enforcement ("ICE") from forcibly entering a home without a judicial warrant.

3.      Without any notice and comment or reasoned explanation, DHS has now abandoned its longstanding policy in favor of a new one that tramples the Fourth Amendment rights of individuals and families across the country, including noncitizens with immigration status and citizens of the United States.

4.      A secret May 2025 memorandum issued by Defendant Todd Lyons (the "Home Entry Memo"), purports to authorize DHS agents to enter a home forcibly without obtaining a judicial warrant if they have an administrative form, called a "Form I-205." This form is issued by a DHS official after a noncitizen has received a final order of removal. No judicial officer or official outside of DHS reviews an I-205 before DHS issues this form to itself.

5.      Under this policy, the same officers charged with arresting and detaining noncitizens are now also allowed to authorize forcible entry into their homes.

1

6.      The Home Entry Memo purports to authorize ICE officers to enter, without a judicial warrant, any home where a person with a final order of removal is believed to be. A final order of removal is a determination, typically pursuant to administrative removal proceedings, that a noncitizen is subject to removal under federal immigration law. Despite the name, a "final order of removal" may be subject to reopening or otherwise to further administrative or judicial review. And in certain circumstances a final order of removal cannot be executed.

7.      The existence of the Home Entry Memo, and the implementation of DHS's new policy authorizing invasions into private homes without consent, a warrant, or exigent circumstances, came to light only because it was disclosed by two anonymous U.S. government officials through counsel.[1] Pursuant to this policy, ICE agents—many of whom are newly hired and do not have a law enforcement background—are being directed to rely on Form I-205s to forcibly enter homes without consent to conduct arrests. One of the whistleblowers has testified to Congress that instructors at the Federal Law Enforcement Training Center ("FLETC") are now directed to verbally train all new ICE agents to follow this policy and to disregard written course materials instructing the opposite.

8.      Pursuant to this unlawful policy, agents have broken down doors and used armed force to enter homes across the country based only an administrative form issued by DHS. With guns drawn and masks on, DHS agents have left children hiding in closets, detained U.S. citizens, and marched people in their pajamas out into the street in sub-zero temperatures.

9.      Plaintiff Abdulkadir Sharif Abdi was in his Minneapolis apartment that he shares with his wife, Plaintiff Rhoda Christenson, on December 1, 2025, when DHS agents, armed only

---

[1] Protected Whistleblower Disclosure Re: Secretive DHS memo authorizes ICE to illegally enter homes without a judicial warrant in violation of the Fourth Amendment, WhistleblowerAid (Jan. 7, 2026), available at: https://perma.cc/7H9T-GFAC. A true copy is attached as Exhibit A.

with an administrative form, pushed through his front door and seized him. Abdulkadir was lawfully living at home under an order of supervision. Abdulkadir was detained for 23 days until a federal judge ordered his release. While Abdulkadir was detained, Rhoda, who was recently diagnosed with a rare form of blood cancer, struggled to care for herself and make her medical appointments without her husband's help. Abdulkadir and Rhoda live in fear that Defendants will again forcibly enter their home and seize Abdulkadir without a judicial warrant.

10.     Plaintiffs Teyana Gibson Brown and Garrison Gibson Brown were in their North Minneapolis home on the morning of January 11, 2026, when armed, masked DHS agents broke down their door with a battering ram. At least ten agents, bearing an administrative form but not a judicial warrant, stormed inside and seized Garrison, who was lawfully living at home under an order of supervision. Agents brandished their assault weapons at Teyana and Garrison, while their then-nine-year-old daughter and the eleven-year-old daughter of Teyana's cousin hid in the closet. Garrison was detained for six days until a federal judge ordered his release. But even after Garrison was released, Defendants rearrested him in violation of the court's order. To this day, Teyana and Garrison are in fear of another forced home entry and seizure.

11.     Plaintiffs Noe Alfredo Salguero and his daughter, Jeyli Salguero, were in their home in Oakdale, Minnesota on the morning of January 14, 2026, when armed, masked DHS agents broke down their front door and stormed into their house. The agents did not have a judicial warrant. Instead, they had an administrative form purporting to authorize the arrest of someone who did not live at the Salgueros' home and was not there that morning. The agents arrested Alfredo, who has had temporary protected status for decades, and his other daughter, Astrid. In the weeks following the home entry, DHS agents returned to the Salgueros' house repeatedly, sitting outside in their vehicles and rummaging through the Salgueros' mailbox

without their permission, photographing their mail, and entering their property. As a result, Jeyli and her mother did not feel safe at their house and left to live with relatives. Alfredo and Jeyli today live in fear that agents will return to their house and again forcibly enter without a judicial warrant.

12.     The new policy reflected in the Home Entry Memo has produced widespread fear among immigrants and their families across the country. It has stripped hundreds of thousands of families of their right to privacy inside their homes and authorizes invasions of private property by armed and masked immigration agents with no judicial oversight or accountability. Indeed, DHS itself has estimated that 1,600,000 people are subject to the new policy. The policy imposes the same terror, insecurity, and risks on countless family members of those subject to final orders of removal, many of them residents with legal immigration status or U.S. citizens.

13.     Plaintiffs bring this lawsuit seeking relief from the unconstitutional and unlawful application and enforcement of the Home Entry Memo policy.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 *et seq*. (Administrative Procedure Act, or "APA"). It has remedial and declaratory authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (APA), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

15.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(A)–(B) and 5 U.S.C. § 703 because Defendants are agencies and officers or employees of the United States, Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

16.     **Plaintiff Teyana Gibson Brown** is a United States citizen and resident of Minneapolis, Minnesota. For 21 years, she has worked as a pediatric intensive care nurse at a hospital in Minneapolis. Teyana is married to Plaintiff Garrison Gibson Brown. The couple lives together with their ten-year old daughter and Teyana's son, both of whom are also United States citizens.

17.     **Plaintiff Garrison Gibson Brown** is a native of Liberia and resident of Minneapolis, Minnesota. Garrison was brought to the United States in 1987, when he was six years old, to avoid civil war in Liberia. Although an immigration judge issued Garrison a final order of removal in 2009, DHS has not been able to effectuate his removal to Liberia. As a result, Garrison has been lawfully residing in Minnesota under an order of supervision for the last eighteen years.

18.     During his nearly three decades in the United States, Garrison has developed substantial relationships and connections to his community. He is married to a United States citizen, Plaintiff Teyana Gibson Brown, and the couple have a ten-year-old daughter who is also a United States citizen. He also cares for his two adult stepsons who consider him their father.

19.     **Plaintiff Jeyli Salguero** is a United States citizen, born in St. Paul, Minnesota, who lives in Oakdale with her father, Plaintiff Alfredo Salguero. After graduating from high school, Jeyli entered community college where she has studied medical technology while working at Walmart.

20.     **Plaintiff Noe Alfredo Salguero ("Alfredo")** is a native of El Salvador and a resident of Oakdale, Minnesota. Alfredo has lived and worked in Minnesota for decades, after first obtaining temporary protected status in 2002. He and his wife, Edith, have raised their

5

family in the St. Paul area, sending their children to public schools and attending the same church for years. After starting as a dishwasher, Alfredo chased opportunities and promotions to become the lead kitchen manager for top chefs at St. Paul's finest restaurants. He made many lasting friendships which he still values today. Alfredo later switched careers to painting, wanting a work schedule that would allow him to spend more time with his children. Currently, Alfredo owns his own residential and commercial painting business. Through his hard work and discipline, Alfredo was able to buy a home in Oakdale for his family.

21.    **Plaintiff Rhoda Christenson** is a United States citizen, resident of Minneapolis, Minnesota, and wife of Plaintiff Abdulkadir Abdi. She and Abdulkadir have been married for eight years and live together in their apartment in Minneapolis.

22.    **Plaintiff Abdulkadir Sharif Abdi** is a native of Somalia and a resident of Minneapolis, Minnesota. Abdulkadir has been present in the United States for nearly 30 years. He works at a homeless shelter and at an addiction recovery center in Minneapolis where he has been commended for his work. Abdulkadir also serves on the board of a local non-profit. In 2018, an immigration judge ordered Abdulkadir removed and granted withholding of removal because of the risks Abdulkadir faced if removed to Somalia due to his public criticism of al-Shabab. In 2019, Abdulkadir was released under an order of supervision, which he has since complied with.

23.    **Defendant Markwayne Mullin** is the Secretary of the Department of Homeland Security and is sued in his official capacity. As DHS Secretary, he oversees component agencies including ICE and the Federal Law Enforcement Training Center.

24.    **Defendant U.S. Department of Homeland Security** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C.

§ 1103(a). DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), and is headquartered in Washington, D.C.

25.    **Defendant Todd M. Lyons** is the Senior Official Performing the Duties of the Director of ICE and is sued in his official capacity. In his role, he purports to oversee ICE's functions, including managing enforcement of laws related to immigration, setting policies governing stops and arrests of individuals by ICE personnel, and managing the civil immigration detention system. He issued the Home Entry Memo while purporting to exercise the authority of the ICE Director.

26.    **Defendant U.S. Immigration and Customs Enforcement** is a component agency of DHS. Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, maintains custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system. ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1), and is headquartered in Washington, D.C. Its agents have forcibly entered the homes of immigrants and United States citizens without a judicial warrant pursuant to the Home Entry Memo.

27.    **Defendant Benjamine Huffman** is Director of FLETC. He is sued in his official capacity. As Director of FLETC, he has authority over all FLETC training goals, plans, and priorities, as well as authority over FLETC curricula, programs, and support activities. This includes FLETC training, education, curricula, and programming that implements the Home Entry Memo.

28.    **Defendant Federal Law Enforcement Training Center** is a component agency of DHS. FLETC trains and instructs federal law enforcement agents across the federal government, including agents and recruits employed by ICE. FLETC is a federal agency within

7

the meaning of the APA, 5 U.S.C. § 551(1), and is headquartered in Glynco, Georgia. FLETC

has graduated thousands of DHS agents trained to forcibly enter homes without a judicial

warrant pursuant to the Home Entry Memo.

## FACTUAL ALLEGATIONS

A.    **The Fourth Amendment and DHS's Longstanding Policies Require a Judicial Warrant to Forcibly Enter a Home.**

1.    **The Fourth Amendment Requires a Judicial Warrant to Forcibly Enter a Home.**

29.    The Fourth Amendment to the United States Constitution provides that: "The

right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized."  U.S. Const. amend IV.

30.    At the core of the Fourth Amendment is "the right of a man to retreat into his own

home and there be free from unreasonable governmental intrusion." *Silverman v. United States*,

365 U.S. 505, 511 (1961). Searches and seizures "inside a home without a warrant" are thus

"presumptively unreasonable." *Payton,* 445 U.S. at 586 (quoting *Coolidge,* 403 U.S. at 477).

31.    The Fourth Amendment requires a warrant issued by a neutral and detached judicial

officer for government agents to forcibly enter a home.

2.    **DHS's Own Regulations and Longstanding Policies Have Recognized the Need for a Judicial Warrant to Forcibly Enter a Home.**

32.    Consistent with these Fourth Amendment constraints, DHS has long recognized

that administrative DHS forms are not judicial warrants and thus do not confer the authority to

forcibly enter a home.

8

33.    DHS's administrative Form I-205, styled as a "Warrant of Removal/Deportation," is drafted, signed, and issued by a DHS immigration officer. These forms are issued by the same officers whose job encompasses arresting and detaining removable noncitizens. Under 8 C.F.R. § 241.2, a long list of immigration officials, all of whom are part of DHS, can issue these forms.

34.    A Form I-205 does not purport to be issued under the authority of a neutral and detached judicial officer. The Form I-205 states on its face that it is issued "by virtue of the power and authority vested in the Secretary of the Department of Homeland Security"—an executive branch official tasked by Congress with immigration enforcement duties. 8 U.S.C. § 1103(a)(1), (5).

35.    Until issuance of the Home Entry Memo, DHS policy was that an administrative Form I-205 authorized immigration officials to detain individuals for purposes of effectuating removal, but only in public places. Under this policy, ICE could not enter the home of a person with a final order of removal to seize that person based on a Form I-205.

36.    This policy was consistent with DHS regulations recognizing the need for a judicial warrant for immigration officers to enter a home. For example, DHS's policy regarding entry of private residences is consistent with the regulations it maintains for site inspections. Under those regulations, immigration officers are not authorized to enter a residence "for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a judicial warrant or the consent of the owner or other person in control of the site to be inspected." 8 C.F.R. § 287.8(f)(2). The Immigration and Naturalization Service ("INS") promulgated this rule against the backdrop of "judicial precedent based on the Fourth Amendment to the Constitution concerning the issuance of warrants [and]

9

the obtaining of consent to enter a premises." Enhancing the Enforcement Authority of Immigration Officers, 59 Fed. Reg. 42406, 42412 (Aug. 17, 1994).

37.     DHS's longstanding training and operational materials confirmed this policy. Training materials from the Basic Immigration Enforcement Training Program, for example, emphasized that "a warrant of removal/deportation does NOT alone authorize a 4th amendment search of any kind."[2] Similarly, ICE's Fugitive Operations Handbook instructed that "[n]either a Warrant for Arrest of Alien (I-200) nor a Warrant of Removal (I-205) authorizes officers to enter the target's residence or anywhere else where the target has a reasonable expectation of privacy. . . . . Therefore, without a criminal warrant, officers must obtain voluntary consent before entering a residence or area where there is a reasonable expectation of privacy. Consent may never be coerced."[3]

38.     Before 2025, ICE legal instructors at FLETC taught agents the policy outlined in paragraphs 32–37: That administrative forms do not authorize entry, let alone forcible entry, into a home; only a judicial warrant, which can be obtained only for criminal offenses, is sufficient. Instructors trained agents that if they do not have consent to enter the home, the agent has no legal authority to do so pursuant to an administrative removal warrant, even if the agent knows the person subject to the warrant is inside the home.

39.     Indeed, a training that was posted on the FLETC website, "ICE Administrative Removal Warrants," is explicit that "[t]here are important differences between a judicially issued

---

[2] Exhibit A at 22 (training materials appended to whistleblower disclosure).
[3] ICE Fugitive Operations Handbook, 18 (effective 2018) (reviewed 2022), available at: https://perma.cc/XN33-LT8Y; *see also* Exhibit A at 9 (whistleblower disclosure quoting the same language from a 2023 ICE Fugitive Operations Handbook).

warrant and an administrative removal warrant issued by a government agency."[4] The training

explained: "[T]he removal warrant used by ICE is not a criminal warrant signed by a federal

judge." It described "the primary difference" between "a criminal warrant issued by a federal

court and a removal warrant issued by an ICE official" as "unlike a criminal warrant issued by

the federal court, a removal warrant does not authorize the ICE officer to enter into an REP

[reasonable expectation of privacy] area to execute the warrant."

40. The FLETC "ICE Administrative Removal Warrants" training further explained

that for a removal warrant "the ICE officer has the authority to arrest the person named in the

warrant, so long as the officer locates the person in a public, non-REP, location." It explained:

"If the officer does not have consent to enter [the home], even if the officer knows the person

subject to the warrant is inside the home, the officer has no legal authority to enter the home

pursuant to that removal warrant." In such a situation, FLETC explained, "that officer must 'wait

it out' . . . until the person named in the warrant can be located in a non-REP area."

41. As of February 2025, DHS guidance recognized that "entering a home to arrest a

person without a warrant or an exception to the warrant requirement is typically a violation of the

Fourth Amendment, regardless of whether the officer has probable cause to arrest the suspect."[5]

42. But in ICE Office of the Principal Legal Advisor Fourth Amendment Refresher

Training Instructor Notes revised in July 2025, after Defendant Lyons's issuance of the Home

---

[4] Federal Law Enforcement Training Centers, ICE Administrative Removal Warrants, available at: https://perma.cc/577C-MUFZ.

[5] Federal Law Enforcement Training Centers, Office of Chief Counsel, Legal Training Handbook, 476 (2025), available at: https://perma.cc/NUQ3-KKBH.

Entry Memo, instructors were directed to describe "the use of Form I-205 for" home entry as "under review."[6]

**B.    Defendants Issued a Secret Memorandum Authorizing Agents to Enter Residences Without Consent or a Judicial Warrant.**

43.    On May 12, 2025, Defendant Lyons issued the Home Entry Memo to all ICE personnel.[7] The Home Entry Memo authorizes ICE officers to forcibly enter homes based only on an I-205 form, with no judicial warrant, to arrest individuals with a final order of removal. It further instructs immigration officers to "knock and announce" and identify themselves and their purpose, and "allow those inside the residence a reasonable chance" for compliance. If the noncitizen or a family member refuses admittance, however, the Home Entry Memo instructs agents to use "force to enter" the residence.

44.    The Home Entry Memo then instructs agents that once inside the home they may conduct a search of the immediate area and seize observed evidence of a crime in plain view. It goes on to instruct agents, in certain circumstances, to inspect "spaces where a person might be found" within the residence.

45.    In a footnote, the Home Entry Memo instructs agents not to enter the curtilage of a private home or the home itself for an arrest without a judicial warrant in the Central District of California because of that court's decision in *Kidd v. Mayorkas*, 734 F. Supp. 3d 967 (C.D. Cal. 2024), a class action, holding that doing so violates the Fourth Amendment.

---

[6] ICE Records Regarding Sensitive Zones, Workplace Raids, and Enforcement Tactics, FOIA Nos. DHS-ICE-25-0213, 25-0481, 25-0956-A, at 289, available at: https://perma.cc/A6HY-K7V7 (Fourth Amendment Refresher Training Instructor Notes (Revised July 2025)).

[7] A true copy is attached as part of Exhibit A at pages 18–20.

46.     The Home Entry Memo does not identify a statutory source of authority for authorizing forcible warrantless home entry. Nor does it provide any analysis to support its conclusion that relevant statutory and regulatory authorities "do not prohibit" its directive.

47.     The Home Entry Memo was issued in secret and distributed only to a few senior DHS officials, who were instructed to ensure that during the training of new agents, the new policy was communicated orally and that written training materials contrary to the new policy were disregarded.

48.     DHS did not follow the notice and comment process required for issuing a substantive rule, including publication in the Federal Register at least 30 days in advance of the rule going into effect and an opportunity for interested persons to offer their views. Instead, DHS actively concealed the Home Entry Memo from the public.

49.     The Home Entry Memo came to light only after two U.S. government officials made a whistleblower disclosure in January 2026, eight months after the issuance of the Home Entry Memo.

50.     Just as a Form I-205 is issued by an executive branch official—not a neutral and detached magistrate—so, too, is the underlying final order of removal that is prerequisite to an I-205. The government has been exerting unprecedented pressure on immigration judges ("IJs") to increase deportations and, on information and belief, has been firing IJs it perceives to prioritize their independent judgment over that goal. The administration has taken the position that IJs are at-will employees who can be fired notwithstanding any statutory employment protections.

51.     The administration has fired 100 of the roughly 700 immigration judges across the country over the last year, often giving no explanation. In hiring their replacements, the

13

government has referred to them as "deportation judges," underscoring its belief that their role is to facilitate the administration's mass deportation goals.

**C.    Defendants Are Training Federal Agents to Enter Homes Without Consent or a Judicial Warrant.**

52.    On February 23, 2026, Ryan Schwank, a former ICE attorney and instructor at FLETC, testified before Members of Congress as a whistleblower about the Home Entry Memo.[8]

53.    In his testimony, Mr. Schwank detailed the content of the Home Entry Memo, the secrecy surrounding its dissemination and implementation, as well as the extent of formal training that ICE trainees are receiving at FLETC pursuant to the Home Entry Memo.

54.    Mr. Schwank testified that he personally taught ICE trainees regarding the policy contained in the Home Entry Memo.

55.    On his first day as an instructor at FLETC, Mr. Schwank was shown the Home Entry Memo "in secret" by his supervisor and was instructed not to discuss the memo, take notes on it, or write down any part of it.

56.    Mr. Schwank was instructed to teach new trainees to follow the Memo. In Mr. Schwank's words, trainees were now being explicitly trained to commit the "chief evil against which the wording of the Fourth Amendment is directed … physical entry of the home without consent or a proper warrant."

57.    Instruction on the policy contained in the Home Entry Memo has replaced the previous training at FLETC, which forbade agents from entering private homes without a judicial warrant or a recognized exception to the warrant requirement.

---

[8] C-SPAN, Sen. Blumenthal and Rep. Garcia Host Forum on Allege Rights Violations by ICE (C-SPAN, Feb. 23, 2026) https://bit.ly/4tdSGSg.

58.    Instruction on the Home Entry Memo itself was conducted under a veil of secrecy. While trainees were instructed to follow the memo, none of the instructions were written down, nor was any record of what was taught maintained by the instructors.

59.    Mr. Schwank further testified that "this memo was never distributed to staff in general."

60.    Furthermore, "the repository where the agency keeps a copy of every official memo" and all DHS policies notably does not contain a copy of the Home Entry Memo.

61.    But it was made clear to Mr. Schwank that, even though the Home Entry Memo was not officially recorded or promulgated in these ways, it was nonetheless official agency policy.

62.    As Mr. Schwank told Members of Congress, "It was made very clear to me that if I did not follow [the Home Entry Memo] I would probably lose my job."  In fact, two attorney advisors had been fired immediately before Mr. Schwank's arrival at FLETC for refusing to teach the Memo.

63.    By Mr. Schwank's estimate, FLETC has graduated thousands of ICE agents trained in the policy of the Home Entry Memo.

**D.    Implementation of the Home Entry Memo Has Caused Plaintiffs Significant and Ongoing Harm.**

**1.    December 1, 2025, Forced Entry into Plaintiffs Rhoda Christenson and Abdulkadir Sharif Abdi's Home.**

64.    On December 1, 2025, Plaintiff Abdulkadir Sharif Abdi was at his home in Minneapolis, Minnesota. Abdulkadir shares an apartment with his wife, Plaintiff Rhoda Christenson, who was not home at the time because she was caring for her elderly mother.

65.     Abdulkadir received a final order of removal to Somalia in 2001. However, the government failed to deport Abdulkadir and in 2018 he was granted withholding of removal to Somalia due to the probability he would be persecuted there because of his public criticism and advocacy against al-Shabab, an Al-Qaeda affiliated terrorist group which controls much of the country's territory. Prior to these proceedings, and again since 2019, Abdulkadir has been living lawfully in the community under an order of supervision. He has never violated the terms of his order of supervision, nor missed a check-in with ICE.

66.     On December 1, around four to five federal immigration officers came to Abdulkadir and Rhoda's apartment building and gained entry. Abdulkadir never received a call from ICE requesting entry to the building before the agents knocked on the apartment door.

67.     Thinking the knock was from apartment maintenance personnel, Abdulkadir opened the door. When he saw the immigration agents, he quickly tried to close it. But before he could close the door, the agents rushed into his home.

68.     The agents demanded Abdulkadir provide his name and identification. The agents, however, did not identify themselves, though they wore ICE badges on their body armor.

69.     The agents told Abdulkadir they had a warrant and arrested him. However, the agents never provided a warrant to Abdulkadir. This is because the agents did not have a judicial warrant when they entered Abdulkadir and Rhoda's home.

70.     The agents first took Abdulkadir to the Whipple Federal Building in Fort Snelling in Minneapolis, then placed him in detention in a suburban county jail, and then shipped him to a county jail in Nebraska where he remained detained for eighteen days until a federal judge ordered his release.

71.     Abdulkadir's arrest and detention has caused tremendous emotional distress and trauma, both to Abdulkadir and to Rhoda.

72.     Abdulkadir feared that his illegal arrest and detention could result in his deportation to Somalia, where he would face grave risk of physical harm or death from al-Shabab. While detained, agents refused to answer Abdulkadir's questions about why he was arrested or whether he would be sent to Somalia in violation of the immigration judge's order withholding his removal.

73.     Abdulkadir also did not have access to his medications while detained. In 2007, he was the victim of a gang attack which permanently damaged his vocal cords. Abdulkadir requires a nebulizer to assist with breathing. He was denied his nebulizer while in federal detention.

74.     Abdulkadir's arrest and detention also caused Rhoda intense emotional distress, as well as financial and personal difficulties.

75.     Shortly before Abdulkadir's arrest last December, Rhoda was diagnosed with myelodysplastic syndrome, a form of blood cancer. Rhoda receives chemotherapy treatment, which is extremely physically taxing. Her husband usually cares for her while she recovers from these treatments but could not while he was detained.

76.     Additionally, Rhoda, who has worked two jobs, relies on Abdulkadir's income to make ends meet. Like many Americans, the couple lives paycheck to paycheck and the loss of Abdulkadir's income was financially challenging. Rhoda had to take off work for most of the week after Abdulkadir was illegally arrested to find a lawyer and work to secure his release.

77.     Though Abdulkadir has since been released, he and Rhoda continue to live in fear that federal agents will again enter their home without a judicial warrant or permission and arrest

17

Abdulkadir. The Defendants' policy of warrantless home entries is still in effect. Federal agents are still being trained to enter homes without a judicial warrant. Abdulkadir remains a target for federal immigration enforcement.

## 2. January 11, 2026, Forced Entry into Plaintiffs Teyana and Garrison Gibson Brown's Home.

78. On the morning of Sunday, January 11, 2026, Plaintiffs Teyana Gibson Brown and Garrison Gibson Brown were in their North Minneapolis home with their then nine-year-old daughter and the eleven-year-old daughter of Teyana's cousin.

79. At around 9:30 AM, several ICE agents arrived at the Gibson Browns' house and began pounding on the front door.

80. Teyana, who had returned home from her job as a pediatric ICU nurse at 7:30 AM, was asleep. Garrison went to the door.

81. Garrison was surprised to see ICE agents at his house. Just two weeks prior, Garrison had reported for his ICE check-in as he had for years with no issues. The next check-in was not scheduled until the end of that same month.

82. The agents told Garrison to come outside because they wanted to talk to him.

83. Garrison, believing that the agents could not enter the house without a judicial warrant, declined and remained in the house. He asked if the agents had a warrant. The agents told him they had a warrant signed by a judge, but they refused to produce it when Garrison asked them to show it to him. Garrison then asked the agents to leave.

84. The agents left the front of the house and went and sat in their vehicles parked in the street. Teyana called her brother, who then came over from his nearby home with his wife. Teyana also alerted her cousin, who came to the house out of concern for her daughter who was there.

18

85. Additional federal agents soon arrived at the house, and several entered onto Teyana and Garrison's yard without permission.

86. Shortly after 11:30 AM, approximately ten additional agents assembled on the steps leading up to the Gibson Browns' front door. All the agents were armed, some with specialized military-grade long guns. The agents stood in a line with their hands on the shoulder of the agent in front of them, a tactical formation used in close quarters combat.

87. Through the window, the Gibson Browns could see the agents preparing to break into their house. They hid their daughter and Teyana's cousin's eleven-year-old daughter in the closet, fearing for their safety.

88. One agent armed with a battering ram walked up to the front door and screamed "We got a warrant, hey we got a warrant!" The agent then smashed open the door with the battering ram.

89. As the front door was flung open, Teyana stepped into the doorway and warned the agents that there were children inside. She twice asked the agents to show her the warrant, and then attempted to shut the door, which was too damaged to latch shut.



*Image 1 – Plaintiff Teyana Brown stands in the doorway of her house as federal agents forcibly enter without a warrant (Source: John Locher, Associated Press)*

90.     The agents did not present Teyana with a warrant, despite her repeated demands to see one. They stormed into the house.

91.     Teyana continued to ask the agents for a warrant, repeatedly, as the agents came into the house. One agent responded that they did not have to provide a warrant. Another responded by brandishing his Taser at Teyana. Another agent pushed Teyana to the ground as she stood by Garrison.

92.     The agents moved throughout the Gibson Browns' house, into the living room and kitchen. There, the agents handcuffed and arrested Garrison and marched him out of the house.

93.    Just before the agents took Garrison out of the house, an agent walked up to Teyana and held out a piece of paper saying it was "signed by a judge."

94.    But the paper the agent left for Teyana was not signed by a judge. It was a photocopied ICE form that had Garrison's name written in pen, and it was signed only by an ICE officer.

95.    The agents did not have a judicial warrant.

96.    Six days later, a federal district court found that DHS had violated both its own regulations regarding supervised release and the Fourth Amendment when agents entered the Gibson Browns' home and arrested Garrison. Am. Order, *Garrison G. v. Bondi*, No. 26-CV-172 (D. Minn. Jan. 17, 2026), Dkt. No. 10. The court ordered Garrison released.

97.    But the day after he was released, Defendants rearrested Garrison in violation of the court's habeas order. An ICE official told Garrison's habeas lawyer that the order to rearrest Garrison had come directly from the White House.

98.    After Garrison's habeas lawyer left intending to file an emergency motion, Defendants reversed course and released Garrison. He has been living in his home ever since under his same reinstated order of supervision.

99.    Because of Garrison's 2009 removal order, the Gibson Browns remain subject to warrantless forcible entry pursuant to the Home Entry Memo. The Gibson Browns are therefore at significant risk of having their home forcibly entered again by Defendants without a judicial warrant.

100.    The agents' unconstitutional entry into the Gibson Browns' home caused significant property damage and emotional harm.

21

101. It took Teyana several days to find a contractor to repair the door. In the meantime, she held the door shut with weights to keep out the subzero winter air.

102. The family faced at least $700 in repair costs, including the door.

103. The Gibson Browns' daughter, now ten years old, and the daughter of Teyana's cousin were present in the house when DHS agents smashed open the door and illegally seized Garrison. Both children were severely traumatized by the experience.

104. The Gibson Browns's daughter has had trouble sleeping and suffers severe anxiety that ICE agents will again return to her house. She will often call her parents repeatedly on their cell phones when they are not with her, sometimes calling ten times in an hour. She is afraid to go outside and had a panic attack when she saw an ICE agent near her school in the days after Garrison was released. The Gibson Browns's daughter is living with serious trauma and fears federal agents will again break into her home and separate her family.

105. The Gibson Browns also have suffered emotionally from Defendants' illegal home entry. Garrison has experienced anxiety and depression and is afraid to leave the house. Teyana also has experienced anxiety and depression since the raid. She was unable to return to work for two weeks. Because of her husband's immigration status, Teyana and the family live in daily fear that federal agents will again break into their home without permission or a judicial warrant and seize Garrison.

**3.    January 14, 2026, Forced Entry into Plaintiffs Jeyli and Alfredo Salguero's Home.**

106. In the pre-dawn hours of January 14, 2026, masked and heavily armed immigration agents broke into the house of Plaintiffs Jeyli Salguero and her father, Alfredo Salguero. Jeyli and Alfredo were still in their bedrooms, as were Jeyli's mother (and Alfredo's wife), Edith, and older sister, Astrid.

22

107.    The officers did not have a judicial warrant. Rather, they had an administrative warrant of arrest for Jose Dimas Cardoza, a person who did not live at the Salgueros' house.

108.    That morning, Jeyli was asleep in her bedroom on the main floor of the house. Alfredo and Edith were asleep in their bedroom adjacent to Jeyli's. Jeyli's sister, Astrid, was in her bedroom in the basement.

109.    At 6:30 AM, Jeyli was startled by loud pounding on the front door. Scared, she ran into her parents' room. Her parents had also been frightened by the loud pounding.

110.    Alfredo rushed to dress. Suddenly, there was a loud crashing noise and the sound of yelling and people moving through the house. Federal agents had broken down the Salgueros' front door and entered their house.



*Image 2 – Federal agents prepare to forcibly enter Plaintiffs Alfredo and Jeyli Salguero's home (Source: Jeyli Salguero)*

111.    Jeyli watched as her father stepped out of his bedroom into the kitchen where he was immediately confronted by masked men in military-style uniforms with assault rifles in their kitchen. The agents pointed their rifles at Alfredo and yelled at him to put his hands in the air.

23

112. Jeyli was scared the agents would shoot her father. Just the week before, federal agents had shot and killed Renee Good in nearby Minneapolis.

113. Alfredo asked the agents what they were doing in his house and asked whether they had a warrant.

114. The agents ignored Alfredo. They moved him into the dining room, handcuffed him, and grabbed his wallet, searching through it and finding his temporary protected status work permit.

115. Jeyli started to film the agents searching through her house with a cell phone, but one agent with a gun drawn quickly grabbed the phone out of her hand. Jeyli screamed in fear. She was able to record the agents for only six seconds.

116. A total of about ten agents came through the broken front door and systematically searched the entire house.

117. As other agents searched the Salgueros' home, three of them marched Alfredo in handcuffs to the living room. They brought Jeyli and Edith into the living room as well. All three were told to sit on their couch.

118. While agents stood over Jeyli and her parents, other agents completed their room-by-room search of the house, repeatedly shouting "clear!"

119. Jeyli's sister, Astrid, was still in her bedroom in the basement as agents were searching through the house. They found and handcuffed Astrid and brought her upstairs to the living room where the rest of the family was being held.

120. The federal agents questioned the Salgueros for roughly ten to fifteen minutes. They asked many questions about the whereabouts of Jose Dimas Cardoza, Jeyli's older half-

24

brother. Jose was married to a United States citizen, and they had lived in Oakdale at a different address before separating.

121. Jose had stayed with the Salgueros on and off some nights during the spring and summer of 2025. He had not been at the Salgueros' house for several months prior to the agents' warrantless home entry on January 14, 2026.

122. The agents left a piece of paper that appeared to be an administrative warrant for Jose Dimas Cardoza. The paper bore no title but stated that Jose Dimas Cardoza was subject to a final order of removal and commanded that he be taken into custody under the authority of the Secretary of Homeland Security. The paper was signed by an unknown person on behalf of Samuel J. Olson, the ICE Field Office Director for St. Paul. The form was dated both October 25, 2025, and January 11, 2026.

123. The agents took Alfredo and Astrid away, and left Jeyli and her mother in the house.

124. Alfredo was held in detention in Willmar, Minnesota for three weeks before an immigration judge ordered his release on bond in early February. Alfredo has no criminal history in this country, and with his temporary protected status Alfredo had been allowed to travel abroad and return to the United States lawfully on multiple occasions, most recently in October 2024.

125. Astrid, who had previously been pursuing an asylum application, received an offer of prosecutorial discretion from ICE in 2024 and her immigration court removal proceedings have been dismissed on that basis. But after her arrest on January 14, 2026, Defendants flew Astrid to a detention facility in Texas. After enduring horrible conditions for

25

several weeks and with the prospect of continuing to do so indefinitely, Astrid acquiesced to DHS's efforts to remove her from the United States.

126. Since the January 14 raid, federal immigration agents have returned to the Salgueros' house several times.

127. Often they sat in their vehicles outside of the Salgueros' house. But several times, they re-entered and searched the Salgueros' property without a warrant.

128. On February 25, 2026, four federal agents parked in front of the Salgueros' house. Two agents opened the Salgueros' mailbox and started rummaging through their mail. One of the agents took photographs of the mail, which the Salgueros' neighbor captured on video:



*Image 3 – Federal agents rummage through and photograph Plaintiffs Alfredo and Jeyli Salguero's mail*

26

129.    On February 27, 2026, multiple federal agents entered onto the Salgueros'

property. One masked agent approached the front door and instructed another masked agent to

hide behind the garage, just out of view of the front door.



*Image 4 – Federal agents enter Plaintiffs Alfredo and Jeyli Salguero's property days after the
warrantless home entry (Source: Jeyli Salguero)*

130.    These continued warrantless searches have only compounded and continued the

fear and distress caused to the Salgueros by the January 14, 2026, warrantless home entry.

131.    Defendants' policy contained in the Home Entry Memo has upended the

Salgueros' lives.

132.    Because of the fear and trauma of the raid, Jeyli and her mother moved out of

their house after the forcible home entry on January 14 and lived with relatives for roughly three

weeks. Jeyli and her mother would return to their house only if they needed something, and then

only during daylight hours.

133. In the weeks after the raid, Jeyli suffered from anxiety and could not sleep or focus. She felt unsafe all the time. Jeyli had to abandon her plans to continue her education and did not re-enroll in community college when the semester started on January 20 due to the stress of the January 14 forcible home entry. She also was unable to work her shifts at Walmart for weeks.

134. Alfredo, who has legal work authorization and owns his own business, lost weeks of business while he was detained. This lost business and lost work hurt the family financially.

135. So long as Defendants' Home Entry Memo remains in effect, Jeyli and Alfredo remain at substantial risk of another forcible warrantless entry into their home.

136. Jeyli and Alfredo continue to live in substantial fear and at significant risk that federal immigration agents will again enter their property and their home without a judicial warrant.

### 4.    Other Forced Home Entries Around the Country.

137. Other individuals have been subjected to forcible home entries following the issuance of the Home Entry Memo.

138. For example, CBS News reported that on October 15, 2025, federal agents forced their way into Gloria Magaña's home in Portland, Oregon. They did not present a judicial warrant. The entry was based on a Form I-205.

139. Ms. Magaña was not home at the time, but her children and partner were. Video taken by one of Ms. Magaña's older daughters shows agents with their guns drawn, telling the family to put their hands up as the youngest of her daughters, a three-month-old baby, cried. One of the agents asked if any of the men inside the room were named Israel. No one in the house goes by that name.

28

140.    Federal agents admitted they were not looking for anyone in Ms. Magaña's residence. However, agents detained Ms. Magaña's 20-year-old son and Ms. Magaña's partner, claiming they were in the United States illegally.

141.    As another example, on January 14, 2026, federal agents banged on the door of ChongLy "Scott" Thao, in St. Paul, Minnesota. In the home were Mr. Thao, his daughter-in-law, and his four-year-old grandson. When the family did not open the door, the agents used a battering ram to force their way in, smashing the door frame. They pointed their automatic rifles at everyone in the house, including the four-year-old.



*Image 5 – Federal agents enter ChongLy Thao's house without a warrant (Source: Leah Mills, Reuters)*

142.    The agents demanded that the Thao family show identification. As Mr. Thao's daughter-in-law was getting his ID from his wallet, the agents said they did not want to see it

because they were in a rush. Mr. Thao is a long-time United States citizen originally from Laos, whose family fled that country after providing assistance to the United States.

143.    The agents forced Mr. Thao to leave with them, erroneously claiming he was in the country illegally and had been convicted of a sex crime. As his grandson watched and cried, the federal agents took Mr. Thao outside in zip ties in sub-freezing weather, clad only in his underwear and his grandson's blanket.



*Image 6 – Federal agents arrest ChongLy Thao and remove him his house (Source: Leah Mills, Reuters)*

144.    As the agents were detaining Mr. Thao, his daughter-in-law asked them to show her a warrant for the home entry. The agents ignored her requests and did not show any documents. On information and belief, the entry was based on an administrative form.

145. Once out of the house, the federal agents asked Mr. Thao for his identification and about his immigration status. He did not have his ID because the agents would not let him retrieve it before they took him from his home.

146. The agents eventually returned Mr. Thao to his home after they realized he was a citizen and not the person they were seeking.

147. As a result of the warrantless invasion of his home, Mr. Thao has publicly stated that he no longer feels safe sleeping there.

**5.      The Home Entry Memo is Causing Plaintiffs Ongoing and Imminent Harms.**

148. Each of the Plaintiffs has suffered an actual forcible home entry. These entries were made without a judicial warrant, in violation of the Plaintiffs' constitutional and statutory rights. Once inside the Plaintiffs' homes, federal agents conducted additional unconstitutional searches, searching through rooms, rummaging through private items, and seizing family members and children through shows of force.

149. Plaintiffs are also suffering ongoing injuries from the Home Entry Memo. Each of the Plaintiffs is either subject to a final order of removal, or lives with someone who is. Under the policy contained in the Home Entry Memo, federal agents may forcibly enter any of the Plaintiffs' homes without a judicial warrant, in violation of the Fourth Amendment, at any time.

150. So long as the Home Entry Memo is in effect, the Plaintiffs are at substantial risk that the Defendants will again forcibly enter their homes without a judicial warrant.

151. Prior to the Home Entry Memo, no Plaintiff ever had federal immigration agents forcibly enter their home without a judicial warrant. This despite the fact that some of the noncitizen Plaintiffs have had final orders of removal for many years; some for more than a decade. Never before have the Defendants used a Form I-205 as supposed authority to enter

31

Abdulkadir's or Garrison's home without consent or a judicial warrant, despite the fact that Abdulkadir's final order of removal was entered eight years ago and Garrison's seventeen years ago. The Home Entry Memo changed all of that, and now all the Plaintiffs—those eligible for a Form I-205 and those who live with them—are at substantial risk that Defendants will once again apply the policy of the Home Entry Memo against them.

152.    The Defendants have not rescinded the Home Entry Memo, nor have they retrained the thousands of federal agents instructed to implement the Home Entry Memo.

153.    The ongoing harms extend beyond the substantial risk of a future forced home entry. Each of the Plaintiffs, as well as their families who live with them, is suffering ongoing stress, anxiety, and fear as a result of the violent, military-style raids on their homes by federal immigration agents.

154.    Teyana and Garrison continue to suffer fear and anxiety from the January 11 raid on their home and the subsequent rearrest of Garrison on orders from the White House. Garrison has been unable to sleep and is suffering from anxiety and depression. Teyana similarly has struggled with severe anxiety and depression since the raid. Their daughter, who hid in the closet with her eleven-year-old cousin as masked and heavily armed agents broke into her house and seized her father, continues to experience fear and anxiety when separated from her parents.

155.    Teyana and Garrison are at substantial risk that federal agents will again forcibly enter their home without a judicial warrant. Garrison is still under a valid final order of removal, and therefore immigration agents may obtain an I-205 for his arrest. And under the Home Entry Memo, federal agents can use this I-205 to again forcibly enter Teyana and Garrison's home. The Gibson Browns have reason to believe that Garrison is a particular target of the Defendants.

After he was rearrested in violation of a federal court order, an ICE officer told Garrison that the White House had directly ordered his rearrest.

156.    Jeyli and Alfredo are also still living with the consequences of the January 14 raid on their home, which resulted in the deportation of Jeyli's sister and Alfredo's daughter, Astrid. Jeyli, who stopped attending community college and work after the raid, continues to fear that federal agents will return to their house and seize her father. Alfredo lives with anxiety from the raid and does not feel secure in the home he worked for years to buy for his family.

157.    Jeyli and Alfredo are at substantial risk that Defendants will again forcibly enter their home without a judicial warrant. The Salgueros' home has remained a target for federal agents, even though the nominal target of the administrative form agents brought during the raid does not live there. In the months after federal agents forcibly entered their home without a judicial warrant, the agents returned twice and entered the Salgueros' property, neither time appearing to have a warrant. So long as the Home Entry Memo remains in effect, federal agents are empowered to return to and forcibly reenter the Salgueros' home using only administrative processes that do not pass constitutional muster.

158.    For Abdulkadir and Rhoda, the fear and anxiety that federal agents will again break into their home and seize Abdulkadir is premised on federal agents' statements to Abdulkadir while he was detained. While in detention, federal agents expressed to Abdulkadir that the Defendants were committed to deporting him, even if they could not arrange a lawful deportation to Somalia. "We are going to find a country for you," they told him. Rhoda continues to receive intensive treatment and chemotherapy for her blood cancer and is awaiting a bone marrow transplant in the coming weeks. She continues to depend on Abdulkadir's caregiving and companionship.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act:**
**Contrary to Constitutional Right (Fourth Amendment)**

159.    Plaintiffs are subject to enforcement of the Home Entry Memo against them in their homes.

160.    Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.

161.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §§ 706(2)(A)-(C).

162.    The Fourth Amendment prohibits law enforcement from forcibly entering a home or other private location without a judicial warrant, consent, or exigent circumstances.

163.    The Home Entry Memo policy of forcibly entering homes without a judicial warrant, consent, or exigent circumstances thus violates the Fourth Amendment.

164.    The Home Entry Memo is a final agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

165.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

166.    As a result of the Home Entry Memo, Plaintiffs are facing ongoing harm and require vacatur of the policy to prevent continued and future irreparable injury.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act:**
**Contrary to Law and in Excess of Statutory Authority (8 U.S.C. § 1357)**

167.    Plaintiffs are subject to enforcement of the Home Entry Memo against them in their homes.

168.    Defendants and their agents have only the authority that Congress has provided them. They cannot exercise power that Congress has not granted. Pursuant to 8 U.S.C. § 1357 Congress has not authorized immigration agents to enter homes forcibly to enforce civil immigration law without having first obtained a judicial warrant or consent.

169.    The Home Entry Memo policy of forcibly entering homes without a judicial warrant or consent are not powers assigned to Defendants by Congress.

170.    The Home Entry Memo is a final agency action that is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

171.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

172.    As a result of the Home Entry Memo, Plaintiffs are facing ongoing harm and require vacatur of the policy to prevent continued and future irreparable injury.

**THIRD CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act:**
**Failure to Provide Notice-and-Comment Rulemaking**

173.    Plaintiffs are subject to enforcement of the Home Entry Memo against them in their homes.

174.    The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Specifically, the APA provides that agencies must "give interested persons an opportunity to participate" in substantive changes in policy, *id*. § 553(c), which requires a meaningful opportunity to comment.

175.    Pursuant to 5 U.S.C. § 551(4) the Home Entry Memo is a legislative rule because it has the force and effect of law and brings about a substantial change in existing law and policy.

176.    The Home Entry Memo reversed Defendants' prior decades-long policy forbidding forcibly entering homes without a judicial warrant, consent, or exigent circumstances. It also altered the rights of hundreds of thousands of people throughout the country who are now subject to having their home invaded by immigration agents.

177.    Despite this sea change with plain impacts on people's rights, Defendants failed to engage in notice-and-comment rulemaking. Far from allowing public comment and input, Defendants kept the Home Entry Memo secret even while training agents to implement it.

178.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

179.    As a result of the Home Entry Memo, Plaintiffs are facing ongoing harm and require vacatur of the policy to prevent continued and future irreparable injury.

### FOURTH CLAIM FOR RELIEF
### Violation of Administrative Procedure Act:
### Arbitrary and Capricious

180.    Plaintiffs are subject to enforcement of the Home Entry Memo against them in their homes.

181.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary,

36

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

182.    In issuing the Home Entry Memo, the agency relied on factors Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, and offered a justification that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

183.    Apart from its incorrect legal conclusion and instructions to agents, the Home Entry Memo contains no analysis about the impact of the new policy, the interests it might implicate, the problems it might cause, or any other aspect of the policy change.

184.    The Home Entry Memo is a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

185.    This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" such agency action. 5 U.S.C. § 706(2).

186.    As a result of the Home Entry Memo, Plaintiffs are facing ongoing harm and require vacatur of the policy to prevent continued and future irreparable injury.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Fourth Amendment**

187.    Plaintiffs are subject to enforcement of the Home Entry Memo against them in their homes.

188.    Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported

by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV.

189. The Fourth Amendment prohibits law enforcement from forcibly entering a home without a judicial warrant, consent, or exigent circumstances.

190. The Home Entry Memo policy of forcibly entering homes without a judicial warrant, consent, or exigent circumstances thus violates the Fourth Amendment.

191. As a result of the Home Entry Memo, Plaintiffs are facing ongoing harm and require declaratory relief regarding this policy to prevent continued and future irreparable injury.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Federal Vacancies Reform Act ("FVRA"), APA, and**
**the Appointments Clause**

192. The ICE Director is an Officer of the United States, U.S. Const. art. II, § 2, cl. 2, who is required to be appointed by the president and confirmed by the Senate. 6 U.S.C. § 113(a)(1)(G).

193. The ICE Director, also called the Assistant Secretary of ICE, "shall establish the policies for performing such functions as are" delegated to the ICE Director or "otherwise vested in the [ICE Director] by law" and "shall oversee the administration of such policies." *Id.* § 252(a)(2), (a)(3)(A), (B).

194. Indeed, ICE recognizes that ICE policies—that is, "guidelines, responsibilities, and procedures impacting multiple ICE Directorates or Program Offices that convey authorities vested in the ICE Director or relating to high profile issues, such as topics with significant DHS,

38

interagency, public, or Congressional interest as determined by the ICE Director"—must be signed by the ICE Director.[9]

195.    The FVRA provides that when the Office of ICE Director is vacant, the "functions and duties" of the Director may be performed in an acting capacity only by "the first assistant to the office of [the Director]" or, alternatively, by a person "direct[ed]" by "the President (and only the President)" to perform those functions and duties. 5 U.S.C. § 3345(a).

196.    Mr. Lyons was not appointed to the Office of ICE Director by the president and confirmed by the Senate.

197.    On information and belief, Mr. Lyons was not and is not the "first assistant" to the Office of ICE Director. The first assistant is instead the Deputy Director of ICE, a position that Mr. Lyons has never held. Mr. Lyons previously was the Executive Associate Director of ICE's Enforcement and Removal Operations directorate.

198.    Although "the President (and only the President)" is authorized to appoint an Acting Director of ICE, 5 U.S.C. § 3345(a), then-Secretary of Homeland Security Kristi Noem purported to appoint Mr. Lyons as Acting Director herself on March 9, 2025.

199.    The issuance of the Home Entry Memo was an agency action.

200.    The issuance of the Home Entry Memo was an action taken in performance of the "functions and duties" of the Office of ICE Director. 5 U.S.C. § 3345(a).

201.    The Home Entry Memo must be vacated under the FVRA because it was issued by an invalidly serving official who performed "functions and duties" of the ICE Director in

---

[9] ICE Directive 1054.1, Policy Governance and Development, *available at* https://perma.cc/PG95-EAJQ.

violation of the FVRA's requirements. 5 U.S.C. § 3348(a)(2). The Memo therefore "shall have no force or effect." *Id.* § 3348(d)(1).

202.    The Home Entry Memo must also be vacated under the APA because Mr. Lyons unlawfully exercised the authority of the ICE Director when he issued the Memo, in violation of the FVRA and the DHS Orders of Succession & Delegation.

203.    Mr. Lyons's issuance of the Home Entry Memo also violated the Appointments Clause of the U.S. Constitution. Art. II, § 2, cl. 2. Mr. Lyons has not been confirmed by the Senate to the Office of ICE Director, and no statute authorized him to exercise the powers of that office in an acting capacity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.    As to Counts 1–4 and 6: Declare unlawful, vacate, and set aside the Home Entry Memo as contrary to law, in excess of statutory authority, arbitrary and capricious, and improperly promulgated without observance of the APA's notice and comment requirements; and

B.    Exercise the Court's authority under 5. U.S.C § 706 to issue all necessary and appropriate relief barring Defendants from enforcing or otherwise giving effect to the Home Entry Memo;

C.    As to Count 5: Declare that the Home Entry Memo violates the Fourth Amendment;

D.    As to Count 6: Vacate the Home Entry Memo pursuant to 5 U.S.C. § 3348(d) and the Appointments Clause;

E.      Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C.

§ 2412 and any other applicable source of law; and

F.      Grant such further relief as the Court deems proper and appropriate.

41

Dated:  April 2, 2026

Respectfully submitted,

*/s/ Michael Perloff*
Michael Perloff, D.C. Bar No. 1601047
Aditi Shah, D.C. Bar No. 90033136
**ACLU Foundation of the District of Columbia**
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
mperloff@acludc.org
ashah@acludc.org

Kristy Parker, D.C. Bar No. 1542111
**Protect Democracy Project**
2020 Pennsylvania Ave NW
Washington DC 20006
Tel: (202) 579-4582
kristy.parker@protectdemocracy.org

Conor Gaffney*
**Protect Democracy Project**
201 St. Charles Ave, Suite 114
New Orleans, LA 70170
Tel: (202) 579-4582
conor.gaffney@protectdemocracy.org

Julia L. Torti*
**Protect Democracy Project**
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
jules.tori@protectdemocracy.org

Jenn Rolnick Borchetta*
Sapana Anand*
**American Civil Liberties Union Foundation**
125 Broad Street
New York, NY 10004
Tel: (914) 462-2363
jborchetta@aclu.org
sanand@aclu.org

Spencer Amdur*
Oscar Sarabia Roman*
**American Civil Liberties Union Foundation**

42

425 California Street, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
samdur@aclu.org
osarabia@aclu.org

Kathryn Huddleston**
Lucia Goin, D.C. Bar No. 1739389
**American Civil Liberties Union Foundation**
915 15th Street NW, 7th Floor
Washington, D.C. 20005
Tel: (212) 549-2500
khuddleston@aclu.org
lgoin@aclu.org

Benjamin Casper*
Teresa Nelson*
Catherine Ahlin-Halverson*
Alicia Granse*
**American Civil Liberties Union of Minnesota**
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 529-1692
bcasper@aclu-mn.org
tnelson@aclu-mn.org
cahlin@aclu-mn.org
agranse@aclu-mn.org

Ian Bratlie*
**American Civil Liberties Union of Minnesota**
424 N. Riverfront Dr. No. 34
Mankato, MN 56001
Tel: (507) 995-6575
ibratlie@aclu-mn.org

James K. Langdon*
Thomas P. Swigert*
Michael Rowe*
**Dorsey & Whitney LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 340-2600
langdon.jim@dorsey.com
swigert.tom@dorsey.com
rowe.michael@dorsey.com

43

Steven J. Wells*
1201 Yale Place, #1806
Minneapolis, MN 55403
(612) 360-7870
stevewells612@gmail.com

*Application for pro hac vice forthcoming.
**Admitted to practice in Texas and Arizona.
Practice limited to federal courts and under the
supervision of a member of the D.C. Bar.

44